AO 91 (REV.5/85) Criminal Complaint                                                         Lisa M. Noller, (312) 353-5314

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

KEVIN LAMAS,
DENNIS ZAMBRANO and
HUGH FERNANDO ZAMBRANO

FILED
AUG 13 2008
8-13-08
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE MASON

CRIMINAL COMPLAINT

CASE NUMBER: 08 CR 645

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __June 26, 2008,__ in __Glencoe__, in the __Northern__ District of __Illinois__ defendants did take and carry away, with intent to steal or purloin, money of value exceeding $1,000, namely, $272,865 in United States Currency, belonging to, or in the care, custody, control, management, or possession of the JP Morgan Chase Bank, 45 Green Bay Road in Glencoe, Illinois, the proceeds of which were then insured by the FDIC,

in violation of Title __18__ United States Code, Section __2113(b)__.

I further state that I am a _____ and that this complaint is based on the following
                                    Official Title
facts:

**See attached affidavit.**

Continued on the attached sheet and made a part hereof: __X__ Yes ____ No

                                                                    _____
                                                                    Signature of Complainant

Sworn to before me and subscribed in my presence,

AUG 1 3 2008
_____
Date

at Chicago, Illinois
   City and State

                                                                    _____
                                                                    Signature of Judicial Officer

Hon. Michael T. Mason
Magistrate Judge

COUNTY OF COOK         )
                       ) ss
STATE OF ILLINOIS      )

I, Mark J. Prejsnar, being duly sworn, do hereby state and depose as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for approximately three years and four months. I am currently assigned to the violent crimes squad of the FBI Chicago's North Resident Agency office located in Rolling Meadows, Illinois. My duties include the investigation of bank robberies and other violent crimes.

2. I make this affidavit from personal knowledge based upon my participation in this investigation, reports I have read, and conversations I have had with others who have personal knowledge of the events and circumstances described herein. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

3. As detailed herein, according to electronic surveillance and statements by bank employees KEVIN LAMAS and DENNIS ZAMBRANO, on June 26, 2008, at approximately 6:45pm, the JP Morgan Chase Bank branch located at 45 Green Bay Road, in Glencoe, Illinois (hereinafter "the bank") was robbed by a black male, wearing a black or dark blue mid-thigh jacket, a hood, a white shirt, dark pants, white gym shoes, dirty black sunglasses, and a glove on at least one hand.

4. According to LAMAS and ZAMBRANO, the robber approached the bank door shortly after the bank had closed and began knocking on the door window. The robber was holding a debit card and a cellular telephone. According to LAMAS when he was interviewed after the robbery, he had assumed the robber was a customer needing assistance with the outside Automated Teller Machine (hereinafter ATM machine) and unlocked the bank door.

5. According to LAMAS, the robber entered the bank and said words to the effect of, "don't look at me" and "give me everything." The robber then ordered LAMAS and ZAMBRANO to take him to the vault room and the room that contained the ATM machines. The robber ordered LAMAS and ZAMBRANO place the money from both the bank's vault safe and two ATM machines into a black, nylon-style bag.

6. According to LAMAS and ZAMBRANO, at one point during the robbery, the robber asked them something to the effect of, "who drives?" ZAMBRANO told the robber that he does not drive, but LAMAS told the robber he drove. The robber asked for LAMAS' car keys, and LAMAS told the robber he parked a blue SUBARU across the street. The robber also took LAMAS' cell phone during the robbery. He did not take any items belonging to ZAMBRANO.

7. According to LAMAS and ZAMBRANO, after the money from the bank vault and ATM machines was placed into the black bag, the robber ordered them to walk into the bank's bathroom. The robber ordered LAMAS to bind ZAMBRANO with zip ties, which he did. The robber then tied LAMAS's arms and legs with zip ties, but he did not tie LAMAS's legs correctly, so LAMAS was still able to somewhat moves his legs. The robber then turned off the lights and left the bathroom.

8. According to LAMAS and ZAMBRANO, the robber used the car keys he acquired from LAMAS and fled the bank in LAMAS' vehicle. He took with him $272,865.00 in United States Currency he had taken from the bank. The vehicle was later found by the Glencoe Police Department.

9. According to LAMAS and ZAMBRANO, after the robber left the bathroom, they laid on the ground for approximately six to ten minutes before they freed themselves and dialed 911.

10. After the robbery, FBI agents and Glencoe Police Department officers interviewed

LAMAS and ZAMBRANO. Neither LAMAS nor ZAMBRANO admitted to knowing the robber, of having any information as to the identity of the robber, or any knowledge of a plan to rob the bank.

11. On August 6, 2008, agents re-interviewed LAMAS regarding the bank robbery. Prior to providing any statements, LAMAS was provided his *Miranda* Rights, which he voluntarily waived. LAMAS said he had not been completely truthful when he was interviewed on the night of the bank robbery. At that time, he again told agents he has known DENNIS ZAMBRANO for approximately two to three years. LAMAS further said that in April or May of 2008, he was at ZAMBRANO's mother's house with DENNIS ZAMBRANO and his brother, HUGO FERNANDO ZAMBRANO. LAMAS and DENNIS ZAMBRANO were talking about closing the bank at the end of the day without the bank manager present. The conversation between LAMAS, DENNIS ZAMBRANO, and HUGO FERNANDO ZAMBRANO escalated into talk of how easy it would be to rob the bank.

12. According to LAMAS, he, DENNIS ZAMBRANO, and HUGO FERNANDO ZAMBRANO again discussed robbing the bank a few weeks later, and talk of the bank robbery got more specific at the second meeting. Among other things, they discussed that the glass at the bank was not bulletproof, the number of employees present when the bank closes at the end of the day and possible ways to escape the bank once the robbery was completed. They also discussed "sitting" on the robbery proceeds for one to two years before spending any money.

13. LAMAS stated that on June 26, 2008 (the day of the robbery), he had been sending text messages to HUGO FERNANDO ZAMBRANO's cell phone. Shortly before the robbery, DENNIS ZAMBRANO asked to use LAMAS' cell phone to send a message to HUGO FERNANDO ZAMBRANO. The message was "You're a tad gay," followed with multiple period dots after the

message, such as "You're a tad gay........." LAMES told agents that DENNIS ZAMBRANO had problems sending a text message on LAMAS' phone, so he asked LAMAS to type and send the messages to HUGO FERNANDO ZAMBRANO. LAMAS estimated that he sent five to six text messages with the period dots. According to LAMAS, the period dots were a coded message indicating how long HUGO FERNANDO ZAMBRANO was to wait before entering the bank. Each period dot indicated one minute of time. LAMAS estimated the last text message he sent HUGO FERNANDO ZAMBRANO had three to five period dots at the end of the message.

14. LAMAS told agents that he knew at the time he let the robber into the bank, he recognized the robber as HUGO FERNANDO ZAMBRANO. After entry, HUGO FERNANDO ZAMBRANO told LAMAS to lock the door. HUGO FERNANDO ZAMBRANO then conducted the bank robbery and gave instructions to LAMAS and DENNIS ZAMBRANO as if they did not know the robbery was going to occur or that they knew the robber was HUGO FERNANDO ZAMBRANO. The robbery took place as LAMAS had described during his first interview with the Glencoe Police Department and the FBI, as detailed in paragraphs 4-10 herein.

15. LAMAS positively identified an Illinois driver's license photo of HUGO FERNANDO ZAMBRANO as being DENNIS ZAMBRANO's brother and also the robber. LAMAS also positively identified the robber in the bank's surveillance system still photographs as HUGO FERNANDO ZAMBRANO. LAMAS also voluntarily agreed to make consensual recordings of conversations with DENNIS ZAMBRANO and HUGO FERNANDO ZAMBRANO.

16. The bank surveillance system functioned properly on the day of the robbery. I have reviewed the video images and compared them to the driver's license photo for HUGO FERNANDO ZAMBRANO, and have determined that they appear to be the same person.

17. On August 7, 2008, LAMAS met with DENNIS ZAMBRANO and HUGO

FERNANDO ZAMBRANO at a restaurant in Chicago, Illinois. LAMAS consensually recorded the meeting with DENNIS ZAMBRANO and HUGO FERNANDO ZAMBRANO, during which time they discussed the robbery and what to do if they were caught. During the meeting, LAMAS asked what had happened to his cell phone (used to send the text messages and then taken by HUGH FERNANDO ZAMBRANO). HUGO FERNANDO ZAMBRANO responded, "Like all over the city," which I believe means it was destroyed. When LAMAS told the ZAMBRANOS that bank investigators had been asking him questions about the robbery, or about his relationship with the ZAMBRANOS, HUGO FERNANDO ZAMBRANO told LAMAS words to the effect of, "all they know is a relationship . . . Just tell them the truth because then you can't get away from it and there's no screwing that up . . . hung out like a handful of times . . . most of which to fix his television . . . it's all legitimate . . . and if you always stay along the lines of the truth, you know. Then you're going to be less nervous number one, okay? Plus, then there's less things we need to talk about. You know, like whatever, like this." HUGO FERNANDO ZAMBRANO later asked LAMAS, "What is it that they're asking?" LAMAS replied words to the effect of, ". . .when that alarm went off in the ATM room. You didn't fucking move. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" HUGO FERNANDO ZAMBRANO responded words to the effect of, "I don't remember an alarm." LAMAS also told DENNIS ZAMBRANO and HUGO FERNANDO ZAMBRANO words to the effect of, "I talked to you guys twice about it, three times. . .you guys came up with the rest and then that fucking day . . .to be completely honest with you . . . I didn't think you [HUGO FERNANDO ZAMBRANO] were going to show up." HUGO FERNANDO ZAMBRANO responded, "Why would you think that?"

18. On August 11, 2008, LAMAS met with DENNIS ZAMBRANO at a bar in Chicago, Illinois. LAMAS consensually recorded the meeting with DENNIS ZAMBRANO. During the

meeting, LAMAS told DENNIS ZAMBRANO words to the effect of, ". . . my phone, my car, my keys, I let them in. Everything dude. You know what I mean? Like, I don't know if you guys did that on purpose?" DENNIS ZAMBRANO replied, "Not at all." DENNIS ZAMBRANO later stated to LAMAS words to the effect of, "Here's what, here's what my brother told me, that we want you to understand. Is that he, he's not going to do anything. Like, he won't admit to anything at all. Even if they are accusing him. He's like he will admit nothing. He will deny everything until, unless they have concrete evidence like 'this is you.' He's like, even then I'll say it was just me and no one else had anything to do with it." LAMAS responded, "I know dude." Later during the meeting, DENNIS ZAMBRANO told LAMAS, ". . . before it happened I knew as much as you did." LAMAS responded, "Yeah, like he [HUGO FERNANDO ZAMBRANO] was going to show up," to which DENNIS ZAMBRANO replied words to the effect of, "Yeah. And because he didn't want to tell me how he was going to do anything. He wanted me to act natural. Like how I would really react. The problem I had with that was I wanted . . . I wanted to know what he had planned because maybe I know, since I work there, maybe I know something he was going to do was a bad idea. . . ."

19.     At the time of the bank robbery, the funds of the bank were insured by the Federal Deposit Insurance Corporation (FDIC).

20. Based on the foregoing, I believe there exists probable cause to believe that KEVIN LAMAS, DENNIS ZAMBRANO and HUGO FERNANDO ZAMBRANO, took and carried away, with intent to steal or purloin, money of value exceeding $1,000, namely $272,865, belonging to, or in the care, custody, control, management, or possession of the JP Morgan Chase Bank at 45 Green Bay Road in Glencoe, Illinois, the proceeds of which were insured by the FDIC on the date of the robbery, in violation of Title 18 U.S.C. Section 2113(b).

Further affiant sayeth not,

Mark J. Prejsnar
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 13th day of August, 2008

Honorable Michael T. Mason
United States Magistrate Judge